United States District Court
Southern District of Texas
ENTERED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

AUG 1 9 2011

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ASARCO LLC, *et al.*, | § | Bankruptcy Case No. 05-21207 |
| | § | |
| Debtors, | § | |

| | | |
|---|---|---|
| ASARCO LLC, *et al.* | § | |
| | § | |
| v. | § | Civil Action No. 2:10-cv-403 |
| | § | |
| BARCLAYS CAPITAL INC. | § | |

### MEMORANDUM OPINION AND ORDER

Barclays Capital Inc. ("BarCap") was the investment banker and financial advisor to ASARCO LLC, the Debtor in above-styled bankruptcy case. After plan confirmation, BarCap requested a fee enhancement of $9,202,500 for its services—$1,202,500 to compensate for "unanticipated services" performed by Lehman Brothers Inc. ("Lehman"), whose assets BarCap purchased during the course of the ASARCO bankruptcy, and $8 million in additional discretionary fees. (Doc. No. 3-86.)[1] The Bankruptcy Court granted BarCap $975,000 for Lehman's "unanticipated services," but denied the other fee enhancements. (*Id.* at 2.) ASARCO LLC, ASARCO Incorporated, and Americas Mining Corporation (together, the "Parent") appealed the Bankruptcy Court's order, arguing that the $975,000 was awarded in error. BarCap appealed the Bankruptcy Court's decision not to award the additional $8 million in discretionary fees. The two

---

[1]In this opinion, the Court refers whenever possible to documents filed on its own docket under 2:10-cv-403 (Doc. No. [#] at [page#]). When the documents are not available under this case number, the Court cites them using the Bankruptcy docket number (Bankr. Doc. No. [#] at [page#]).

actions were consolidated by order of this Court.

## SUMMARY OF THE FACTS

ASARCO LLC ("ASARCO" or the "Debtor"), originally a United States-based mining company, was purchased by a Mexican mining corporation, Grupo Mexico S.A.B. de C.V. ("Grupo" or "Parent"), in 1999. In 2005, ASARCO, facing a mounting labor crisis, billions of dollars in environmental and asbestos liability, and a decline in copper prices, filed for bankruptcy in the Southern District of Texas. Soon after the bankruptcy was initiated, ASARCO filed an application to retain Lehman as its "financial advisor and investment banker." (Doc. No. 3-131.)

Under the terms of the engagement letter, Lehman was to perform the following services:

a.     Advise and assist the Company[2] in formulating a plan of reorganization and/or analyzing any proposed plan, including assisting in the plan negotiation and confirmation process of a Restructuring Transaction under Chapter 11 of the Bankruptcy Code;

b.     In connection therewith, provide financial advice and assistance to the Company in structuring any new securities to be issued in a Restructuring Transaction;

c.     Participate in negotiations among the Company and its creditors, unions, suppliers, lessors and other interested parties relating to the Chapter 11 Case;

d.     Participate in hearings before the bankruptcy court with respect to the matters upon which Lehman Brothers has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith;

e.     Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services;

---

[2]In Lehman's and BarCap's engagement letters, ASARCO LLC is referred to as the Company. In their briefing, the parties have referred to ASARCO LLC and its related entities as "Debtors." This Court refers to ASARCO LLC and its related companies as "ASARCO" or "Debtor" in this opinion.

  f. Upon request, review and analyze any proposals the Company receives from third parties in connection with a Transaction, including, without limitation, any proposals for debtor-in-possession ("DIP") financing and/or exit financing;

  g. Assist the Company in connection with the Company's liquidity analysis;

  h. Review and analyze the Company's business, operations, properties, financial condition and prospects and financial projections (including business plans provided by the Company);

  i. Evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

  j. Analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by any Transaction;

  k. Provide strategic advice with regard to restructuring or refinancing the Company's financial obligations;

  l. Assist in the drafting, preparation and distribution of selected information and other related documentation describing the Company and the terms of a potential transaction;

  m. Assist the Company in identifying, contacting and evaluating potential purchasers for any Sale Transaction; and

  n. Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring Transaction or a Sale Transaction, as requested.

(Doc. No. 3-133 at 7–8, ¶3.) Specifically excluded under the Lehman Letter of Engagement were "accounting, audit, 'crises management,' or business consultant services," "designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or any advice or opinions with respect to solvency in connection with any transaction." (*Id.* at 14, ¶16.)

  ASARCO agreed to compensate Lehman for its services under the following terms: Lehman would be paid (1) a monthly cash fee of $100,000 for two years, then $75,000 per month beginning

in August 2007 and (2) a $4 million transaction fee.  One hundred percent of all monthly fees for 24 months and 50% of all monthly fees paid thereafter would be creditable against the transaction fee. The Bankruptcy Court issued an order approving this arrangement on October 13, 2005, pursuant to 11 U.S.C. §§ 327(a) and 328(a).[3]  (Doc. No. 3-133.)

During Lehman's employment, ASARCO twice moved to expand the scope of Lehman's retention and engagement.  Lehman claimed that it was expending more time and effort on the case than anticipated and that it had performed work, and anticipated being asked to perform more work, outside the scope of the original retention agreement. (Docs. Nos. 3-169, 3-178.)  Although the Bankruptcy Court approved three additional discrete payments for certain valuation services, it did not approve ASARCO's request to retroactively increase Lehman's fees for the period between April 2007 and September 2008 from $75,000 a month to $150,000 a month.  (Doc. No. 3-192.)  It found that Lehman was "bound by the terms of its original engagement but could, under § 328(a), apply for additional compensation at the end of its employment if it could prove that its original terms and conditions were 'improvident in light of developments not capable of being anticipated at the time of fixing of such terms and conditions.'" (Doc. No. 3-86 at 5.)  Lehman was paid over $4 million for its services under its engagement. (Doc. No. 3-228 at 1.)

In September 2008, Lehman, itself, entered bankruptcy.  BarCap then acquired Lehman by

---

[3]Section 327(a) permits the trustee, with the court's approval, to "employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (2006). Section 328(a) specifies that the trustee may compensate these professionals "on any reasonable terms and conditions of employment," with the bankruptcy court's advance approval of these terms and conditions. *Id.* § 328(a). The bankruptcy court may later alter these agreed-upon terms only if they "prove to have been improvident in light of developments not capable of being anticipated at the time of fixing such terms and conditions." *Id.*

4

way of an asset purchase agreement. Among the purchased assets were "Purchased Contracts," including the agreement between ASARCO and Lehman. BarCap informed the Debtors that it was not prepared to continue under the contract's terms, so BarCap and the Debtors renegotiated the terms of their engagement as set out in the BarCap Engagement Letter.[4] On November 26, 2008, the Bankruptcy Court issued an order modifying and approving the BarCap Engagement Letter, under which BarCap would receive a monthly retainer fee of $225,000 and a transaction fee of $5 million, which would be triggered by either the sale of substantially all of ASARCO LLC's assets or a restructuring, regardless of the value of BarCap's services. (Doc. No. 3-226.) (This fee has already been paid and is not being questioned by either party to this appeal.) In contrast to the Lehman Engagement Letter, the BarCap Engagement Letter provided no mechanism for crediting the retainer fee against the transaction fee. The letter also gave BarCap the right to seek a "discretionary fee based on the outcome of the case." (*Id.* at 9, ¶6(f).) Even if some of the services that resulted in the award of discretionary fees were performed by Lehman, the entire fee would be paid to BarCap. (*Id.* at 21). Pursuant to the parties' own request (Doc. No. 3-221 at 11), the Bankruptcy Court approved this arrangement under § 328(a).

On April 14, 2009, this Court entered a judgment in favor of ASARCO LLC in the case captioned *ASARCO LLC and Southern Peru Holdings, LLC v. Americas Mining Corporation*, 404 B.R. 150 (S.D. Tex. 2009) (the "SCC Judgment"). The SCC Judgment, which among other things

---

[4]The Bankruptcy Court held that BarCap could negotiate these new terms for their contract because (1) BarCap received an assignment of the Lehman contract and (2) an executory contract may be assumed as amended by the parties as long as the amendment is consensual. (Doc. No. 3-86 at 16.) The assigned contract also gave BarCap the right to seek compensation for services already performed by Lehman. (*Id.*) The parties have not raised the propriety of this decision on appeal.

returned millions of shares in an extremely valuable copper mine to ASARCO, was one of ASARCO's chief assets.  Interested in monetizing the SCC Judgment, ASARCO proposed an auction of the judgment to achieve the highest and best offer. (Doc. No. 3-259 at 3–4.) BarCap was responsible for organizing the SCC Judgment auction.  In June 2009, ASARCO moved to expand the scope of BarCap's retention and employment as its financial advisor in connection with the auction and potential sale of the SCC Judgment. (*Id.*) The terms of this proposed expansion, found in BarCap's Proposed Supplemental Engagement Letter, included a proposed payment of either a Successful Sale Fee or a Successful Bid Fee of up to $6 million.  (*Id.* at 27, ¶5(a) and (b).)  The Bankruptcy Court never approved the Supplemental Engagement Letter.

On November 13, 2009, this Court entered its Memorandum Opinion, Injunction, and Order of Confirmation, under which the Parent's plan was approved and the Parent, the owner of ASARCO LLC when it entered bankruptcy, reacquired ASARCO.  The Parent's plan was a full payment plan, resulting in one of the most successful bankruptcies in the United States in history.  After the plan was confirmed, BarCap filed a Final Fee Application requesting additional reimbursement for Lehman's services as well as its own. (Doc. No. 3-48.)  BarCap also filed applications for the allowance of an award of a discretionary fee (Docs. Nos. 3-46, 3-58, 3-349), seeking, in addition to the compensation sought in its Final Fee Application, a "discretionary fee" of $9,202,500.  This amount was comprised of (a) $1,202,500 for "unanticipated services" performed by Lehman; (b) $2 million for the overall success of the reorganization cases (the "Success Fee"); and (c) $6 million for the "successful SCC Judgment auction" (the "SCC Auction Fee"). (Doc. No. 3-86 at 2.)  The Bankruptcy Court ruled that the Final Fee Application should be approved and that BarCap should receive an additional $975,000 pursuant to § 328(a) for "unanticipated services of Lehman." (*Id.* at

2.) The Bankruptcy Court denied BarCap's request for the $2 million Success Fee and the $6 million SCC Auction Fee.

The Parent appealed the Bankruptcy Court's award of $975,000 for unanticipated services performed by Lehman. BarCap appealed the denial of the $2 million Success Fee and the $6 million SCC Auction Fee.

## STANDARD OF REVIEW

This Court reviews a bankruptcy court's compensation award for "abuse of discretion." *See Gibbs & Bruns LLP v. Coho Energy Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 204 (5th Cir. 2004). "This 'abuse of discretion' standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Daniels v. Barron (In re Barron)*, 325 F.3d 690, 692 (5th Cir. 2003) (*Barron II*) (citations omitted). Findings of fact are reviewed for clear error; conclusions of law and mixed questions or fact and law are reviewed de novo. *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 318 (5th Cir. 2005).

## I. The $975,000 Award for Unanticipated Services

When the Bankruptcy Court approved the Lehman Engagement Letter in 2005 at the beginning of the bankruptcy proceeding, it did so pursuant to 11 U.S.C. § 328(a). (Doc. No. 3-133 at 1.) Section 328(a), which allows the trustee in a bankruptcy to hire certain professionals for an agreed-upon payment with the bankruptcy court's approval, provides:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment,

> if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a) (2006).  The purpose of this provision is to attract professionals to do work for

a bankruptcy estate.  Professionals may be "unwilling to work for bankruptcy estates where their

compensation would be subject to the uncertainties of what a judge thought the work was worth after

it had been done." *Donaldson Lufkin & Jenrette Sec. Corp. v. National Gypsum Co. (In re National*

*Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997).  Section 328  allows professionals to "avoid that

uncertainty by obtaining court approval of [the] representation and fee arrangement prior to

performing the contemplated services." *Barron II*, 325 F.3d at 693.

In order to bring about the goals of § 328, the Fifth Circuit has interpreted that provision as

strictly limiting the power of the bankruptcy court to alter the compensation of professionals

approved under it. Once a compensation plan has been approved under § 328, the bankruptcy court

may allow different compensation only if the terms of the original agreement "prove to have been

improvident in light of developments not capable of being anticipated at the time of the fixing of

such terms and conditions." 11 U.S.C. § 328(a); *Barron II*, 325 F.3d at 693.  The Fifth Circuit has

also emphasized that this strict standard requires that circumstances actually be "incapable of

anticipation, not merely unanticipated," a distinction that is "not insignificant." *Barron II*, 325 F.3d

at 693; *see also Daniels v. Barron*, 225 F.3d 583, (5th Cir. 2000) (*Barron I*) (remanding bankruptcy

court's fee order when the bankruptcy court altered compensation approved under § 328 based on

a finding of "developments unforeseen").

The Bankruptcy Court found that BarCap met this strict standard.  The Bankruptcy Court

clearly stated that "the basis for a catch-up, bonus, or enhancement under § 328(a) is the

8

'improvident in light of developments not capable of being anticipated' standard. To obtain a §

328(a) adjustment, BarCap must prove that the 'intervening circumstances must have been incapable

of anticipation, not merely unanticipated.'" (Doc. No. 3-86 at 13.)  The Bankruptcy Court made

several findings of circumstances and information that Lehman did not know at the time it entered

into the engagement that would make its arrangement improvident. First, it found that when the

Debtor and Lehman entered into their original engagement, "the Debtors' restructuring process was

expected to take the form of a quick sale . . . . The Debtors expected the bankruptcy to take about

one month." (Doc. No. 3-86 at 5.)  It also found that Lehman's review of all relevant industry

information about ASARCO indicated that a quick liquidation was reasonable. Since ASARCO was

(and is) a non-public subsidiary of a foreign company, Lehman "had no way of knowing . . . that the

Company had serious deficiencies in its internal management capabilities and reporting systems.

Further, no one could have anticipated that the chief executive officer would be removed . . . within

one month . . . or that the Board would be replaced twice within the first months of this case." (*Id.*

at 6.) The Bankruptcy Court also found that Lehman did not know that the Debtor "lacked effective

executive-level leadership [and] faced a severe liquidity crisis, internal reporting and controls were

practically non-existent, and there was essentially no internal communication." (*Id.*)  Due to the

Debtor's practice of deferring all important operating and financial decisions to the Parent, the

existing management was also "unaccustomed to making high-level decisions." (*Id.*)

Moreover, the Bankruptcy Court found that Lehman, at the Parent's request, undertook

several tasks to stabilize the company outside the normal scope of an investment banker, "because

a quick sale under these conditions would not maximize the value of the Debtors' estate." (*Id.*) The

Bankruptcy Court grouped these services into 6 main areas:

9

1.  Lehman worked to resolve ASARCO's liquidity crisis, a "service beyond the scope of a traditional investment banker." To that end, it negotiated the terms of a debtor-in-possession financing facility ("DIP") and worked to resolve operational crises caused by the ongoing labor strike, both of which were instrumental in avoiding a disadvantageous quick liquidation.

2.  Lehman recruited new members to ASARCO's board of directors, and upon the board's request advised ASARCO's management on a daily basis on tasks that the debtor's management typically performs.  This work included preparing "numerous reports analyzing budget and cash flow projections and certain metal purchase agreements," and Lehman professionals were permanently on-site at the Debtor's Tucson offices.

3.  Lehman developed an employee retention plan upon ASARCO's request, an area specifically excluded from the scope of work in the August 2005 Engagement Letter, because ASARCO was losing personnel at such an alarming and unusual rate. Although some management upheaval is expected in chapter 11 cases, "it would be difficult to forecast that a company with the size, complexity and history of ASARCO would lack depth of management to the extent of company."

4.  Lehman filled ASARCO's management vacuum caused by the dismissal of ASARCO's CEO and the absence of a CFO.  Lehman acted in place of a CFO and later assisted the new CFO in several tasks, such as creating reports for constituents, managing communications with financial advisors and creditors, and obtaining and analyzing financial information.

5.  Lehman led searches for a new CEO and contacted Joseph Lapinsky, whose work as CEO was of enormous benefit to ASARCO.  Lehman also worked to retain for ASARCO the management consulting firm of Alvarez & Marsal.

6.  Lehman designed and implemented a copper hedging program, "unique for a chapter 11 debtor outside of the ordinary course of the debtor's business," and expended many hours achieving a consensus regarding the hedging program among ASARCO's many creditors.

(*Id.* at 7–12.)

The Bankruptcy Court further found that Lehman had spent many hours performing tasks that were outside the scope of its engagement letter and the expected tasks of an investment banker. Ultimately, the Bankruptcy Court found that Lehman's contracted fees were below market rate and

improvident, noting that "the history of this case was extraordinary.  No one foresaw the length or complexity of the case."  (*Id.* at 14.)  The Bankruptcy Court determined that reasonable compensation for Lehman was the rate negotiated by the Debtor and Lehman later in the case of $150,000 per month.  Therefore, "Lehman was entitled to the difference between the original rate ($75,000) and the later rate ($150,000) from the date of its request for additional compensation (August 2007) until the end of its employment (September 2008)—thirteen months at $75,000 per month, or $975,000."[5]  (*Id.*)

The Parent contends that the Bankruptcy Court failed to apply § 328's rigorous "incapable of anticipation" standard to BarCap's request for a fee enhancement.  Although the Bankruptcy Court quoted the correct standard for a fee enhancement, the Parent points out that in approving the $975,000 fee increase for Lehman's services, the Bankruptcy Court stated that "the history of this case was extraordinary. *No one foresaw the length or complexity of this case*."  (*Id.*) (emphasis added).  Moreover, the Bankruptcy Court characterized the $975,000 as payment for "unanticipated services of Lehman."  (*Id.* at 2.)  In these two instances, the Bankruptcy Court used the words "[n]o one foresaw" and "unanticipated," which the Parent argues demonstrates that the Bankruptcy Court, in fact, failed to apply the "incapable of anticipation" standard to the fee enhancement and applied merely an "unanticipated" standard, despite its earlier identification of the proper rule.

The Parent further argues that the circumstances of the case do not, and could never, support

---

[5]BarCap asked for $1,202,500 to make up for Lehman's "unanticipated services" based on an increase of Lehman's fees from $75,000 to $150,000 from April 2007 through September 2008. (Doc. No. 3-58 at 7–8.) The Bankruptcy Court awarded BarCap the equivalent of $75,000 per month from August 2007 (when it asked to increase its monthly compensation) to September 2008.  BarCap has not appealed the Bankruptcy Court's award of $975,000 instead of the requested $1,202,500.

a finding that Lehman's fee arrangement was improvident in light of developments incapable of being anticipated at the time. Initially, the Parent notes that the Lehman Engagement Letter provided for a fee of $100,000 for at least two years, and $75,000 a month thereafter, thus suggesting that the parties at least contemplated a lengthy engagement. In addition, the Parent argues, Lehman touted itself as an expert in the industry and argued for its retention based on express comparison to its work in handling complex and lengthy Chapter 11 cases. (Doc. No. 3-131 at 15.) The Parent also disputes the Bankruptcy Court's findings of services that Lehman performed outside of the engagement letter and argues that most of these services were, in fact, provided for in the Lehman Engagement Letter. (Doc. No. 12 at 18–21.) The Parent argues that since the Lehman Engagement Letter covered the services that the Bankruptcy Court found to be "unanticipated," they were clearly not "incapable of anticipation." Consequently, the Parent contends, the Bankruptcy Court's finding that the agreement was "improvident" is in error.

BarCap, on the other hand, argues that the Bankruptcy Court properly awarded the $975,000 to Lehman, based on the proper standard. BarCap first notes that the services that Lehman performed involving "crises management," "business consultant services," and "operating, organizational, administrative, cash management or liquidity improvements" were specifically excluded from the Lehman Engagement Letter. (*See* Doc. No. 3-133 at 14, ¶16.) BarCap next argues that, contrary to ASARCO's assertion, the Bankruptcy Court properly applied § 328(a) "incapable of anticipation" standard. BarCap asserts that Lehman could not have anticipated the Debtor's lack of leadership or lack of internal reporting or controls because it assumed that ASARCO would operate as a typical business in its industry and of its size. (Doc. No. 16 at 34.) It contends that It could not have anticipated the Debtors' liquidity crisis because it did not have access to confidential

12

information and relied on the Debtors' expectation of a quick sale. (*Id.*) Finally, BarCap urges that Lehman could not have anticipated, and did not anticipate, that it would be asked to provide a wide range of services not typically performed by an investment banker. (*Id.*) BarCap contends that the Parent wants this Court to ask, in assessing a fee enhancement under § 328(a), "whether an investment banker could *ever* anticipate that a hypothetical bankruptcy case—but not this particular case—could last years or be complex." (*Id.* at 35.) BarCap argues instead that the proper method is to look at the facts and circumstances of the particular restructuring, and that the facts of this case support the Bankruptcy Court's conclusion.

The Court finds that the Bankruptcy Court's award of $975,000 to BarCap for Lehman's services was proper. First, this Court holds that the Bankruptcy Court applied the proper standard in considering the fee award. Although the Bankruptcy Court's order included the phrase "[n]o one foresaw the length and complexity of this case" and awarded fees for Lehman's "unanticipated services," the Bankruptcy Court clearly set out and implemented the proper "incapable of anticipation" standard in its order. Further, in many places in the same order, the Bankruptcy Court used language that supports the conclusion that it used the § 328 standard. For example, it wrote that "the services performed by Lehman made the compensation originally agreed to by Lehman improvident"; "the conditions that led to the additional responsibilities were not capable of being anticipated at the time of the original employment agreement, as further set forth below"; "Lehman was unaware—and indeed had no way of knowing—that the Company had serious deficiencies in its internal management capabilities and reporting systems"; "no one could have anticipated that the chief executive officer would be removed by the Parent within one month of Lehman's retention or that the Board would be replaced twice within the first months of the case"; and "Lehman's

contracted fees were well below market rate and thus were improvident." The Bankruptcy Court's statement that "[n]o one foresaw the length and complexity of this case" was simply a phrase used for emphasis, not an indication of the standard under which the Bankruptcy Court analyzed the fee request. The Bankruptcy Court clearly identified the proper § 328 standard and applied it. There was no legal error in this regard.

Having determined that the Bankruptcy Court applied the proper legal standard, the Court now turns to a review of the Bankruptcy Court's factual determination that Lehman's agreement was improvident and incapable of anticipation. As noted above, this Court reviews the Bankruptcy Court's findings of fact for clear error. While the Court is "not required to rubber stamp the [lower] court's findings [of fact] simply because they were entered," *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 409, 409 (5th Cir. 2001), the Court should reverse only "if left with the definite and firm conviction that a mistake has been committed." *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 309 (5th Cir. 2003) (internal citations omitted).

Under this deferential standard, this Court affirms the Bankruptcy Court's determination that Lehman's arrangement was improvident and incapable of anticipation when it was made. There is ample evidence in the record to support the Bankruptcy Court's conclusions that the length and complexity of the bankruptcy were incapable of anticipation when Lehman entered into the engagement letter. Evidence from George Mack (managing director of BarCap and previously Lehman) and Jorge Lazalde (vice president and general counsel to the Parent) indicates that all parties involved expected a quick sale when Lehman was engaged.[6] Evidence from Mack and

---

[6]Lazalde, when asked if Grupo had an estimate of the duration of the ASARCO bankruptcy when it was filed in August 2005, testified that "[a]ccording to the legal opinion we received from Baker Botts it was just a matter of a month." (Doc. No. 3-121 at 286.) Mack

Malcolm Lovett (former director of ASARCO) also supports the finding that Lehman performed many services outside the scope of its original agreement, the need for which was incapable of anticipation when the agreement was made. This Court finds that the Bankruptcy Court's finding that BarCap deserved $975,000 to make up for Lehman's services was supported by the record and not clearly erroneous; therefore, the Court affirms the award of $975,000 to BarCap.[7]

---

stated by proffer that in Lehman's initial conversations with ASARCO, the CEO at that time stated that the restructuring process was "expected to take the form of a quick sale, as ASARCO was unlikely to survive for long . . . ." (Bankr. Doc. No. 15044 at 7.) While this Court agrees with much of the evidence cited by the Bankruptcy Court and with the suggestion that the evidence supports that Lehman anticipated a "quick sale," this Court has difficulty accepting that the parties actually believed that any resolution would occur in a month, irrespective of the source of the prediction. This Court finds it incredible that any sophisticated lawyer or advisor actually thought that this bankruptcy would last for only one month. Even the terms of the Lehman Engagement Letter clearly suggest that it would last much longer. This Court's conclusion on this point, however, does not undermine its finding that the overwhelming evidence supports the judgment of the Bankruptcy Court.

[7]The Parent also contends in this appeal that Lehman's numerous interim applications for monthly fees and expenses, in which Lehman stated that the fees were fair, reasonable and consistent with the market, are "binding judicial admissions" that prevent BarCap from now claiming that the arrangement was improvident. (Doc. No. 12 at 28.) BarCap argues that interim applications are not final adjudications on the question of compensation and therefore are subject to final adjustments and fully reviewable. While this Court clearly comprehends the basis for the Parent's argument that Lehman, and BarCap, consistently represented to the Bankruptcy Court that their fees were fair and reasonable and consistent with the market, only to turn around at the end of the bankruptcy to argue that they were vastly unfair, the Court does not ultimately consider that these statements necessitate the conclusion that BarCap was not due additional compensation. First of all, the Court notes that the applications referred to are all interim applications and as such were only snapshots. They are not hindsight reviews viewing the entirety of the bankruptcy history and role of the applicant as is the motion currently under consideration. The fact that the bills were fair for the Debtor does not in the long run mean that Lehman was not underpaid. Therefore, even if these statements are admissions, they are limited in their scope. Secondly, a party may introduce evidence contrary to an admission when the admission is not the basis of the objections initially lodged. See White v. ARCO/Polymers, Inc., 720 F.2d 1391, 1396 (5th Cir. 1983). The Parent's objection to the fee request (Bankr. Doc. No. 13110) did not mention these so-called judicial admissions, nor did it suggest that the contrary evidence should be barred on that basis.

**II. The $2 Million Success Fee**

In its motion for a fee enhancement, BarCap requested $2 million for "the overall success of the Chapter 11 cases." (Doc. No. 3-361 at 7.)  BarCap's request for a $2 million Success Fee is based on ¶6(f) of the BarCap Engagement Letter, which gave BarCap the right, at the conclusion of the bankruptcy, to seek a discretionary fee from the Bankruptcy Court above its monthly retainer fees and the transaction fee.  As mentioned previously, after BarCap purchased Lehman's assets and assumed Lehman's contracts with ASARCO, it renegotiated its terms of employment.  These new terms were set out in the Bankruptcy Court's Final Order Granting ASARCO LLC's Application for Retention of BarCap, in which the Bankruptcy Court approved with modifications the BarCap Engagement Letter. (Doc. No. 3-226.) In addition to the $225,000 monthly fee and the $5 million transaction fee, the order approving the letter gave BarCap the right to seek a "discretionary fee based up on the successful outcome of the case."[8]

In a motion filed on behalf of itself and BarCap, the Debtor specifically asked the Bankruptcy Court to approve the terms of BarCap's engagement under § 328, emphasizing that "Congress

---

[8]The exact language of the pertinent portion of the BarCap Engagement Letter reads as follows:

> BarCap and the Company hereby agree that BarCap shall be entitled to apply to the court for final approval of an additional discretionary fee based upon the successful outcome of the Chapter 11 case.  This fee shall be based upon a variety of factors including but not limited to quality of service, creativity of advice, and comparable market rates, all of which should be evaluated by the most objective standard available.  The discretionary fee herein replaces, and shall be in lieu of, the discretionary fee set forth in the engagement letters between Lehman Brothers and the Company . . . . Any such fees shall be paid only to Bar Cap, without regard to whether a portion of the fees were performed by Lehman Brothers . . . .

(Doc. No. 3-226 at 9, ¶6(f).

16

intended in section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the Court's approval of the retention . . . ." (Doc. No. 3-221 at 11.) The Bankruptcy Court, *as per the parties' request*, approved the engagement pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code and emphasized that "fee applications filed by Bar Cap shall be subject to review pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code and not subject to the standard of review set forth in Section 330 of the Bankruptcy Code." (Doc. No. 3-226 at 3.)

The BarCap Engagement Letter provided a non-exclusive list of factors to consider in determining the amount of the discretionary fee, if any, to be awarded if the Chapter 11 Cases are successful: (1) "the quality of service"; (2) "the creativity of advice"; and (3) "comparable market rates." (*Id.* at 9, ¶6(f).) In its application for the discretionary fee, BarCap asserted that "the successful outcome of these Chapter 11 Cases . . . resulted in no small measure from the quality of BarCap's service, the creativity of its advice, and the perennial dependability of its employees." (Bankr. Doc. No. 13405 at 4.) BarCap also characterized its services as "directly responsible for ASARCO avoiding liquidation, and instead, surviving to benefit from the dramatic rise in copper prices"; attributed the full payment of creditors to the "significant contributions of BarCap"; claimed to have played a "crucial role" and provided ASARCO with "indispensable support" and "essential assistance"; and asserted that its "creativity and expertise" were "primary drivers in achieving a full payment plan." (*Id.* at 4, Doc. No. 3-361 at 5–6.) BarCap requested $2 million specifically as a reward for the "overall success of the Chapter 11 Cases, which is attributable in large part to the substantial efforts, strategy and dedication of the BarCap professionals." (Doc. No. 3-361 at 7.)

The Bankruptcy Court denied the $2 million Success Fee because it found, contrary to

17

BarCap's assertions, that the Parent's full payment plan was attributable to a "coalescence of factors," including (1) a rise in copper prices in 2009; (2) the SCC Judgment; (3) the Parent's desire to retain ownership of ASARCO; (4) the Parent's desire to end litigation involving environmental and asbestos claims; (5) the Bankruptcy Court's handling of the case; and (6) other participants, constituents, professionals, and attorneys. (*Id.* at 19.) While the Bankruptcy Court recognized that BarCap had performed important and beneficial services to ASARCO, it found that BarCap was adequately compensated for these services under the terms of the BarCap Engagement Letter. (*Id.* at 19–20.) Therefore, taking into consideration the factors listed in the BarCap Engagement Letter, the Bankruptcy Court found that no additional compensation was warranted.

BarCap argues that the Bankruptcy Court erred in not granting it the $2 million Success Fee. First, it asserts that the Bankruptcy Court should have analyzed the propriety of the Success Fee under 11 U.S.C. § 330.[9] Section 330 provides that after notice and a hearing, the bankruptcy court may "award to . . . a professional person employed under § 327 . . . reasonable compensation for actual, necessary services rendered . . . and . . . reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). BarCap argues that ¶6(f) of the fee agreement does not set a specific amount for the Success Fee, and that when an agreement does not set a specific rate, the § 330 reasonableness test applies. *Peele v. Cunningham (In re Tex. Sec., Inc.)*, 218 F.3d 443, 445 (5th Cir. 2000) ("Section

---

[9]This Court notes that BarCap has not been entirely consistent in arguing which standard—§ 330 or the three factors set out in the fee agreement approved under § 328—should control. In its motions seeking a fee enhancement it urged the Bankruptcy Court to use § 330. (Doc. No. 3-58, Doc. No. 3-349.) In oral argument before the Bankruptcy Court, however, counsel for BarCap argued that the Bankruptcy Court could not ignore the three factors because "you have your 328 contract." (Doc. No. 3-124 at 28.) Having lost in the court below, BarCap asserts in its appeal to this Court that the Bankruptcy Court should have considered the award of the Success Fee primarily under § 330. The Court notes that the Parent has also been somewhat inconsistent on this issue.

328 applies when the bankruptcy court approves a particular rate or means of payment, and § 330 applies when the court does not do so.").

BarCap argues that when § 330 applies, a bankruptcy court no longer looks to the parties' agreement and instead applies § 330's enumerated factors.[10] These factors include:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). BarCap argues that if the Bankruptcy Court had considered these factors in assessing whether BarCap was entitled to the Success Fee, it would have "been apparent that the requested fee was reasonable," (Doc. No. 16 at 41), because all of § 330(a)(3)'s factors support BarCap's requested fee.

BarCap further contends that its request for the Success Fee is supported by the totality-of-the-circumstances test set out in the BarCap engagement letter. To reiterate, ¶6(f) of the approved fee agreement provided for the Bankruptcy Court to assess a fee enhancement to BarCap based on

---

[10]BarCap cites *In re XO Communications, Inc.*, 398 B.R. 106, 113–15 & 119 n.7 and *In re Cahill*, 428 F.3d 536 (5th Cir. 2005), for this proposition.

(1) the quality of service, (2) the creativity of advice, and (3) comparable market rates. BarCap argues that the Bankruptcy Court based its ruling on "one misapplied factor"—its erroneous finding that BarCap had been compensated at market rates—to the exclusion of the other two factors, which were the quality of service and the creativity of advice. Moreover, BarCap argues that the Bankruptcy Court's finding that BarCap was compensated at market rates was incorrect. BarCap contends that when BarCap and the Debtor entered into the BarCap Engagement Letter, they established the Success Fee in ¶6(f) as a mechanism to bring BarCap's compensation up to market rates. George Mack stated by proffer that ASARCO's Board was unwilling to negotiate true market terms for BarCap's engagement when BarCap assumed Lehman's contract. (Bankr. Doc. No. 15044 at 12.) Therefore, the parties agreed to "provide market compensation to Bar Cap for its services and for the services that had been performed by Lehman Brothers and for which the Debtors had not paid market rates" in another way: if the bankruptcy was successful, "Bar Cap would be 'trued up' to a market rate." (*Id.* at 13.) It argues that this agreement was memorialized in ¶6(f).

BarCap argues that, without the $2 million Success Fee, Lehman's and BarCap's total compensation for 24,099 hours of work was $13,416,775, resulting in fees of less than $520 per hour. (Docs. Nos. 16 at 45, 3-58 at 24.) Even with the $2 million Success Fee, BarCap asserts, the hourly rate would be $640 an hour. (Doc. No. 16 at 45.) The Parent's own expert testified that the average market rates would be $895 per hour (Bankr. Doc. No. 15110 at 127), and BarCap's expert set the amount at $1,761 per hour. (Doc. No. 16 at 45.) BarCap argues that since its compensation clearly falls below these amounts, the Bankruptcy Court's denial of the $2 million Success Fee, based on its finding that BarCap was paid at market rates, was clearly in error.

The Parent argues that BarCap was compensated at market rates for its services, as the

Bankruptcy Court found—it asserts that over the 14 months of BarCap's engagement, it was paid what amounts to a $591,630 monthly fee,[11] well within the market range of $411,000–$608,000 reflected in BarCap's expert testimony. (The expert also testified that BarCap's fee over those 14 months was on the high end.) (Doc. No. 3-126 at 58–59.)  It also contends that the Bankruptcy Court's ruling was correct because the court did, in fact, consider the nonexclusive factors set out in the BarCap Engagement Letter in reaching its decision.

This Court holds initially that the Bankruptcy Court correctly considered BarCap's request for the Success Fee under the terms of the BarCap Engagement Letter.  The BarCap Engagement Letter, like the Lehman Engagement Letter, was approved under § 328 of the Bankruptcy Code, not § 330.  Section 328, as discussed above, seriously limits the power of a bankruptcy court to award compensation that departs from the terms that have been approved.  In its application to the Bankruptcy Court, filed on its behalf and BarCap's, the Debtor specifically asked the Bankruptcy Court to approve the agreement under § 328(a) so that the Debtor and BarCap could establish their own specific, agreed-upon arrangements that could be altered only under the "incapable of anticipation" standard. (Doc. No. 3-221 at 11.)  The agreed-upon terms, which the Bankruptcy Court approved pursuant to the parties request under § 328, included the agreement that the Bankruptcy Court would evaluate the fee request considering "a variety of factors including but not limited to quality of service, creativity of advice, and comparable market rates, all of which should be evaluated by the most objective standard available." (Doc. No. 3-226 at 9.)

The fact that the BarCap Engagement Letter did not set out a specific amount to be awarded

---

[11]The difference in numbers results, at least in part, from the Parent's considering only BarCap's engagement and payment in calculating average monthly rates, while BarCap adds together its payment and Lehman's to reach average rates.

21

as part of the Success Fee does not change the analysis. The letter did set out specific factors to be considered, and it was within a fee arrangement approved under § 328. Further, the Bankruptcy Court's order approving the BarCap Engagement Letter recites that any future fee application should be judged pursuant to § 328. No one objected to that order. BarCap has not cited a case in which a bankruptcy court applied § 330 factors to a fee arrangement actually approved under § 328, and the cases that it cites for the proposition that § 330 factors trump the strictures of the parties' agreement do not concern fee arrangements approved under § 328. In *In re Cahill*, the Fifth Circuit upheld a bankruptcy court's analysis of § 330 factors to trump a fee request to which no party had objected but that had not been pre-approved under § 328's strict standard. *In re Cahill*, 428 F.3d at 538–540. In *In re XO Communications*, the bankruptcy court considered § 330's reasonableness factors, and ignored the factors proposed by the parties, to award a fee that had been sought *but never approved* under § 328—therefore § 328's restrictions did not apply. *In re XO Commc'ns*, 398 B.R. at 109–10. In the instant case, the terms of the BarCap Engagement Letter, including the factors to be considered in awarding a Success Fee, not only cited § 328 as the standard to be used but were approved under § 328. The Bankruptcy Court order specifically stated that fee applications would be considered pursuant to § 328. Parties have a right to contract their fee arrangements and have them approved by the Bankruptcy Court in advance under § 328. Consequently, the Bankruptcy Court correctly used the factors in ¶6(f) in determining whether to award the Success Fee.

Further, this Court holds that the Bankruptcy Court fully considered and analyzed the factors listed in ¶6(f) of the BarCap Engagement Letter in assessing BarCap's fee request. BarCap's contention that the Bankruptcy Court "rejected any award based solely on one misapplied factor"

instead of applying "¶6(f)'s totality-of-the circumstances test" is not supported by the Bankruptcy Court's order. First, it should be noted that this provision gives great discretion to the Bankruptcy Court: BarCap "*shall be entitled to apply to the court* for final approval of an additional discretionary fee based upon the successful outcome of the Chapter 11 case." Further, the considerations of the fee award were many: "This fee shall be based upon a variety of factors *including but not limited to*" the three factors mentioned above. The Bankruptcy Court was not obligated to run through a checklist covering just those three factors and decide on the balance of its answers.

Moreover, the Bankruptcy Court's order shows that it did, in fact, consider the other factors listed in ¶6(f). As BarCap itself points out, the Bankruptcy Court found that "BarCap's advice, commitment, and undertaking of a variety of tasks, including those that are typically not performed by investment bankers, provided benefits to the estate." (Doc. No. 3-86 at 20.) While BarCap argues that this finding proves that the Bankruptcy Court based its decision on one misapplied factor (market rates), it just as readily shows that the Bankruptcy Court did consider the creativity of BarCap's advice and the quality of its service. There was no mandate that a simple finding that BarCap provided creative advice and high-quality service automatically entitled BarCap to a discretionary fee.

Even if BarCap is correct that the proper standard for determining whether to award BarCap a success fee is § 330 and not ¶6(f), this Court still finds that BarCap is not entitled to the $2 million Success Fee. Given the Bankruptcy Court's findings of fact, this Court finds that it would uphold the Bankruptcy Court's denial of the $ 2 million Success Fee had the Bankruptcy Court explicitly considered the request under § 330. Section 330, like ¶6(f), vests the decision of fee amount, if any,

in the bankruptcy court and leaves it up to its discretion. *See In re Cahill*, 428 F.3d at 539 (noting

that § 330 gives the bankruptcy court discretion, even to award compensation less than the amount

requested). Although BarCap argues that the Bankruptcy Court erred by not explicitly considering

all of § 330's factors, the Bankruptcy Court's findings of fact implicate them all. Its finding that

BarCap was paid market rates for its services based on its contract rates and the additional $975,000

awarded encompasses the § 330 factors of (A) the time spent on their services, (B) the rates charged,

(D) the reasonableness of the time spent on the problem, and (F) the reasonableness of the

compensation compared to customary compensation. Its finding that BarCap's "advice,

commitment, and undertaking of a variety of tasks" provided a substantial benefit to the estate

incorporates the factors of (C) whether BarCap's services were necessary or beneficial toward the

completion of the case and (E) BarCap's demonstrated skill and expertise.[12] Even taking into

account all of the § 330 factors, given the Bankruptcy Court's findings of fact, this Court finds that

the Bankruptcy Court did not err in denying the $2 million award under this statute. The Bankruptcy

Court properly exercised its discretion to deny the Success Fee.[13]

---

[12]The Court has labeled the § 330 factors with their corresponding letter from the statute for reference and matched them to the Bankruptcy Court's separate findings of fact.

[13]The Parent also argued that even if the Court were to consider the propriety of the $2 million award under § 330, the proper standard for determining whether a fee enhancement should be awarded at all is the "rare and exceptional" standard, requiring the professional to have demonstrated more than a merely "excellent result"—he must demonstrate "exceptional efficiency." *In re Mirant Corp.*, 354 B.R. 113, 142 (Bankr. N.D. Tex. 2006), *aff'd*, 308 Fed. App'x 824 (5th Cir. 2009). It argues that BarCap cannot meet this standard because it was hired to provide "high-quality and creative financial-advisory services," which it did. (Doc. No. 17 at 28). BarCap rejoins that the $2 million Success Fee is not a "fee enhancement" such that it would trigger the "rare and exceptional" standard because it was viewed as a "true-up" to make up for the discount rates established in the BarCap Engagement Letter. This Court does not need to settle this particular spat because it finds the denial of the fees proper under either provision.

24

Finally, the Bankruptcy Court found that the success of the bankruptcy was due not exclusively to BarCap's services but to a "coalescence of factors." This Court agrees. *See In re ASARCO LLC*, 420 B.R. 314, 319 (S.D. Tex. 2009). The Bankruptcy Court's findings of fact on which it relied to deny the Success Fee were not clearly erroneous, and this Court thus affirms its denial of the $2 million Success Fee.

### III. The SCC Judgment Auction Fee

Finally, BarCap argues that the Bankruptcy Court erred in not approving its requested $6 million fee for conducting a "successful SCC judgment auction." In June of 2009, ASARCO moved to expand the scope of BarCap's retention in connection with the auction and potential sale of the SCC Judgment. The terms of this expansion, found in BarCap's Proposed Supplemental Engagement Letter, included a proposed payment of either a Successful Sale Fee or a Successful Bid Fee (but not both) of up to $6 million.[14] (Doc. No. 3-259.) The Bankruptcy Court *never* approved the Supplemental Engagement Letter; but BarCap worked to design and implement an auction process nonetheless, ""reserv[ing] its rights regarding compensation therefor." (Bankr. Doc. No. 12008 at ¶4 n.2.)

The Bankruptcy Court found that this auction process ultimately "generated nothing more than non-binding, fractional interest bids . . . . None of these bids were ever accepted by ASARCO

---

[14]A "Successful Sale Fee" would be awarded if the SCC Judgment was sold. A "Successful Bid Fee" would be awarded if ASARCO received one or more "Bona Fide Offers," even if it did not enter into a sale agreement. (Doc. No. 3-259 at 27.) A "Bona Fide Offer" is defined in the Supplemental Engagement Letter as a written, legally binding commitment by a potential purchaser that is determined by the Board of Directors to be bona fide and beneficial to the Company, not contingent on financing, and for a minimum amount agreed upon by BarCap and the Board of Directors. (*Id.* at 26.)

LLC or the Court." (Doc. No. 3-86 at 22). It also found that ASARCO LLC abandoned the auction process early in the confirmation process because of a lack of meaningful bids, and that "[w]hile it is possible that the threat of an auction may have played an important part in the Parent's decision to propose its full payment plan, the auction was not successfully completed." (*Id.* at 22–23.) Finally, the Bankruptcy Court found that the marketing of the SCC Judgment was "covered by the terms of the BarCap Engagement Letter and BarCap did not need any further compensation to explore an auction of this asset." (*Id.* at 21.)

BarCap asserts that the Bankruptcy Court erred in finding both that the SCC Judgment auction was covered by the BarCap Engagement Letter and that the process did not generate any binding bids. BarCap argues that the engagement letter clearly omitted key language concerning the SCC Judgment auction which was later included in the Supplemental Engagement Letter, such as "analyzing and evaluating various strategic and financial alternatives available with regard to the SCC Judgment"; "coordinating potential investors' or purchasers' due diligence efforts, including creating and maintaining a data room"; "evaluating proposals received from potential purchasers of the SSC Judgment"; "assist[ing] in negotiations with and related strategy concerning potential buyers of the SCC Judgment"; or "developing bidding procedures for the sale . . . of the SCC Judgment." (Doc. No. 16 at 48–49.)  Further, BarCap argues that the Debtor was clearly convinced that the BarCap engagement letter did not include SCC Judgment auction services because it solicited bids from other firms to perform the work. (*Id.* at 49.)  Since the auction allegedly was not included in the original engagement letter, BarCap argues, the Bankruptcy Court should have analyzed the fee request under the reasonableness factors of § 330—which it did not do.

BarCap also asserts that the Bankruptcy Court erred in finding that the auction process did not produce any binding bids. BarCap argues that its efforts, in fact, resulted in three binding bids—and the last bid was the binding offer from Sterlite that eventually pushed the Parent to propose the full payment plan that made these Chapter 11 Cases such a great success.[15] (Doc. No. 16 at 50–51.)

The Parent argues that the Bankruptcy Court correctly denied BarCap the award of the $6 million SCC Auction Fee. First, it contends that the Bankruptcy Court correctly decided that the SCC Judgment auction was covered by the BarCap Engagement Letter. Further, the Parent disputes BarCap's assertion that the auction process led to binding bids. It argues that the Second Sterlite Purchase and Sale Agreement, which incorporated the SCC Judgment, was entered into before the Supplemental Letter of Engagement was filed and was not submitted as part of the auction process. The only bids actually generated drastically undervalued the SCC Judgment asset and were never accepted by the Debtor. Therefore, the Parent argues, since the auction was an "abject failure," BarCap is not entitled to any Success Fee related to its role in the SCC Judgment auction.

The Court finds that the SCC Judgment auction was covered by the initial BarCap Engagement Letter, that the Supplemental Engagement Letter was never approved and therefore never agreed to, and that there was never a successful auction. Consequently, the $6 million SCC Auction Fee is not warranted. The BarCap Engagement Letter provided for BarCap to assist with "a possible sale, merger, consolidation or other transaction or series of transactions involving the

---

[15]BarCap also notes that the Bankruptcy Court, itself, stated in a previous order that "ASARCO received a binding bid for [the] SCC Litigation Trust Interests on August 14, 2009." (*See* Doc. No. 3-34 at 30.)

transfer or all or a portion of the business, assets or equity interests of the Company or reorganized Company." (Doc. No. 3-221 at 16, ¶1.)  It also provided that BarCap would "[a]ssist the Company in identifying, contacting, and evaluating potential purchasers for any Sale Transaction." (*Id.* at 17, ¶3(n)).  The SCC Judgment, although a unique asset, was certainly an asset belonging to the Debtor—in fact, it was one of its key assets. BarCap has argued that since the SCC Judgment had not come into existence in November 2008 when the BarCap Engagement Letter was entered, it cannot be an asset as contemplated under that engagement.  The Bankruptcy Court rejected this claim because BarCap's own retained expert, Johnt T. Young, "agreed that the litigation was an economic—not an accounting—asset" and that Malcolm Lovett, former director of ASARCO, "likewise testified that the SCC litigation claims were assets of the estate." (Docs. Nos. 3-86 at 21 n.5; 3-126 at 30–31; 3-408 at 104–05.)

This Court agrees that, even though the SCC Judgment was not entered when the BarCap Engagement Letter was approved, the impending SCC Judgment was clearly already considered one of ASARCO's assets.  The liability opinion was issued on August 30, 2008, before BarCap's engagement and even before Lehman entered bankruptcy. For this reason, the Bankruptcy Court did not err by not analyzing the $6 million fee request under § 330.

Further, this Court notes that whether or not the bids were "binding" does not control whether or not the auction was "successful." BarCap appears to argue that if the Bankruptcy Court erred in finding that there were no binding bids, its conclusion that the auction process failed—and that therefore BarCap should not receive a $6 million fee enhancement for it—is also erroneous. This Court finds, however, that whether or not binding bids were received, the auction process, while

perhaps beneficial, was still not a success such that BarCap's services in that regard were "pivotal" to the Debtor. The "two binding bids" that BarCap notes were a bid for a fractional interest in the judgment with an implied value of the whole being $500 million, and a bid to pay "45% of the difference between the aggregate allowed minority claims of the general unsecured creditors against ASARCO minus the distributions available at closing to satisfy these creditors, up to a maximum of $500 million, in exchange for 100% of the SCC Litigation Trust."[16] (Doc. No. 3-317 at 28.) These bids do not prove that the auction was a success. Professor Kenneth Klee, expert for ASARCO, estimated that these bids undervalued the SCC Judgment by 15–25%. (Doc. No. 3-317.) Shannon Ratliff, expert for Harbinger, found that the bids discounted the SCC Judgment by 10–30%. (Bankr. Doc. No. 11935.) Nor is this Court convinced by BarCap's assertion that the auction process produced a "binding bid" in the form of Sterlite's offer to purchase the Debtor and the SCC Judgment.

Ultimately, however, the question of binding bids is irrelevant. The SCC auction was covered under the original BarCap Engagement Letter, and therefore BarCap has already been paid for those services.   There was never an executed, court-approved supplemental engagement agreement. There was not a completed, successful auction. As such, the Bankruptcy Court did not err by not applying § 330, nor did it err in not awarding the requested $6 million award.

---

[16]The Parent argues that these bids would not even have merited the $6 million Successful Bid Fee under the unapproved Supplemental Engagement Letter because they were not "Bona Fide" offers as defined in the letter. (Doc. No. 17 at 34.) Although the argument has merit, the Court finds that it is ultimately unimportant whether or not these bids satisfied the terms of the never-approved Supplemental Engagement Letter because the SCC Auction was covered by the original BarCap Engagement Letter.

**Conclusion**

For the reasons stated above, the Court affirms the Bankruptcy Court's Order on Fee Application and Fee Enhancement Motion of Barclays Capital Inc. (Doc. No. 3-86.)  The Court affirms the award of a $975,000 discretionary fee to BarCap and the denial of the $2 million Success Fee and the $6 million SCC Auction Fee.

Signed this 19th day of August, 2011.

Andrew S. Hanen
United States District Court

30